## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

RUDY LLOREDO and CHRISTOPHER
PELKY, individually and on behalf of all
others similarly situated,

        Plaintiff,

vs.

RADIOSHACK CORPORATION,

        Defendant.

Case No. 04-cv-20991

Judge:  William H. Hoeveler

Collective Class Action
[29 U.S.C. § 216(b)]

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT,
## CLASS REPRESENTATIVE PAYMENTS, FEE AWARD AND COSTS

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs

respectfully submit this memorandum supporting their motion for final approval of

the proposed settlement, the proposed class representative payments, and the

proposed cost reimbursement and fee award.

## I.    THE LAWSUITS

The proposed settlement, if approved, would resolve five lawsuits pending

against RadioShack, all involving, in some fashion, RadioShack's failure to pay

overtime wages to managers of its larger-volume stores.  The larger-volume stores

are called "Y" Stores, and their managers are called "Y Store Managers" or "YSMs."

The first class action was filed on October 31, 2002 by Alphonse Perez and

Douglas Phillips in *Perez v. RadioShack Corp.,* No. 02-cv-7884 (N.D. Ill.) ("*Perez*").[1]

---

[1] Two additional persons (David Tibbetts, Asher Warso) were also initially listed as named Plaintiffs
in *Perez,* but only Messrs. Perez and Phillips remained in that capacity throughout the litigation.

*Perez* alleged that RadioShack violated the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* by not paying overtime wages to its YSMs.

Six weeks later, on December 11, 2002, Mark Goldman filed a second class action in state court, which had been in the investigative stages since before *Perez* was filed.  It was ultimately removed to federal court and re-captioned *Goldman v. RadioShack Corp.,* No. 03-cv-0032 (E.D. Pa.) ("*Goldman*").  *Goldman* alleged that RadioShack's failure to pay overtime wages to its YSMs violated the FLSA and two Pennsylvania statutes: the Minimum Wage Act, 43 P.S. § 333.102 *et seq.,* and the Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*  The action was filed so Pennsylvania YSMs could avail themselves of the more favorable provisions under state law, including the ability to participate through an opt-out (rather than an opt-in) device, and an extended statute of limitations tolled immediately upon the complaint filing date (rather than the later opt-in consent form filing date).

The third class action was filed about two years later, on April 28, 2004, by Rudy Lloredo and Christopher Wright in *Lloredo v. RadioShack Corp.,* No. 04-cv-20991 (S.D. Fla.) ("*Lloredo*").  *Lloredo* was filed so persons who did not opt in to *Perez* by the court-ordered deadline could seek relief under the FLSA.

The fourth and final class action was filed about two years after that, on February 6, 2006, by Brendan Birns and Christopher Pelky in *Birns v. RadioShack Corp.,* No. 06-cv-9099 (S.D.N.Y.) ("*Birns*").  *Birns* similarly was filed so persons who did not opt in to *Perez* or *Lloredo* by the deadlines could seek relief under the FLSA for payment of their unpaid overtime wages.

The fifth action that would be resolved by the proposed settlement was brought by David Tibbetts in the United States District Court for the Northern District of Illinois, in *Tibbetts v. RadioShack Corp.,* No. 06-cv-9099 (S.D.N.Y.) ("Tibbetts").  This individual action was based on RadioShack's alleged retaliation against Mr. Tibbetts for being initially listed as a named Plaintiff in *Perez.*

## II.   THE CLAIMS

### A.    The "80/80" Test

The first step in successfully maintaining an action for unpaid overtime wages under the FLSA and the two Pennsylvania statutes is to establish that the class member did not regularly and customarily supervise the equivalent of two full-time employees.  Under these statutes, if this element is established, the class member is entitled to overtime wages, without the need for any further analysis. *See* 29 C.F.R. § 541.119(a); 34 Pa. Code § 231.82(6).[2]

In *Perez,* after significant briefing and argument before both the magistrate and district judges, Plaintiffs sought and obtained a ruling that this element could be established through an objective standard.  The *Perez* rulings provided that any class member who did not have employees clocking in at least 80 combined hours during at least 80% of the weeks when he or she was YSM during the class period did not regularly and customarily supervise the equivalent of two full-time

---

[2] All citations to the provisions under the FLSA, the two state statutes and their regulations are to the versions in effect prior to the 2004 amendments, pursuant to the parties' agreement that these pre-amendment versions are applicable to the cases at hand.

employees, and was thus entitled to summary judgment and back overtime wages. *Perez v. RadioShack,* 386 F. Supp. 2d 979 (N.D. Ill. 2005).[3]

A similar motion for partial summary judgment was briefed and argued in *Goldman,* but the *Goldman* Court declined to adopt this objective standard or enter summary judgment in favor of either party. *Goldman* instead went to trial on this and all other issues, and the jury ultimately found in favor of RadioShack. That jury finding, and certain court rulings alleged to have contributed to it, are the subject of an appeal pending before the United States Court of Appeals for the Third Circuit. As with all appeals, the *Goldman* class members face a significant uphill battle in reversing these decisions and obtaining a recovery in favor of those class members who would have met the objective standard set forth in *Perez.*

No similar motion was filed in *Lloredo* and *Birns.*

**B.    The "Primary Duty" Test**

If the 80/80 Test requirements are not met, a class member can recover back overtime wages only by showing that his or her primary duty was something other than management. *See* 29 C.F.R. § 541.119(a); 34 Pa. Code § 231.82(6). The factors to consider are: (1) the percentage of time spent on non-managerial tasks; (2) the relative importance of non-managerial versus managerial tasks; (3) the frequency with which discretionary powers are exercised; (4) the relative freedom from supervision; and (5) the relationship between the salaries and wages of the class member versus his or her employees. *See* 29 C.F.R. § 541.103.

---

[3] This affirmed the findings in Magistrate Judge Nan R. Nolan's April 6, 2006 memorandum opinion.

The *Goldman* jury evaluated whether the primary duty of Pennsylvania YSMs was management, and found that it was.  RadioShack thus obtained a verdict in its favor against all *Goldman* class members.  As mentioned above, that verdict and the rulings leading up to it are the subject of a pending appeal.

*Perez* has not yet been tried, but the *Perez* court has similarly cautioned that "Plaintiffs face an uphill battle in arguing that management was not their primary duty."  *Perez,* 386 F. Supp. 2d 979, 984, *citing Perez v. RadioShack Corp.,* No. 02 C 7884, 2003 WL 21372467, at *7 (N.D. Ill. June 13, 2003).

*Lloredo* and *Birns* did not yet reach a point where the court opined on the strength or weakness of this argument; however, a summary judgment motion was pending in *Lloredo.*  Additionally, the court in another overtime wage class action filed against RadioShack in Wisconsin shared the same view as the *Goldman* jury and the *Perez* court.  In fact, on September 15, 2006, that court entered summary judgment in RadioShack's favor after finding that the certified class held a primary duty of management and were properly classified as exempt from the overtime wage provisions of the FLSA and Wisconsin state law.

## III.   THE LITIGATION

In the almost five years that have passed since the first class action was filed, motions to allow the cases to proceed as collective and/or class actions were briefed, argued and granted in *Perez, Goldman* and *Lloredo.*[4]  *Birns* had not yet reached the certification stage.

---

[4] *Goldman* sought and obtained collective certification for the FLSA claims and class certification for the state claims.  *Perez* and *Lloredo* sought and obtained collective certification under the FLSA.

The partial summary judgment motions addressed above, dealing with the "80/80" test, were also briefed and argued in *Perez* and *Goldman.*  Plaintiffs also successfully opposed motions by RadioShack for summary judgment in *Perez* and *Goldman,* after significant briefing and argument.

The parties also engaged in extensive discovery subject of numerous motions to compel that were vigorously briefed and argued.  Through the discovery process, Plaintiffs obtained tens of thousands of pages of materials, and painstakingly reviewed, evaluated and organized them for use in supporting and opposing motions and preparing for trial.  Plaintiffs also collaterally investigated the facts.

The parties also participated in more than 100 depositions of the named Plaintiffs, class members, district managers, regional managers, sales associates, and other officers, employees and agents of RadioShack.

Plaintiffs also retained and worked with experts, defended their depositions, and submitted briefs and arguments in opposition to motions to preclude them from testifying at trial.  Plaintiffs also evaluated reports from and deposed the many experts retained by RadioShack, and briefed and argued motions to preclude them from testifying at trial.

The *Goldman* Plaintiffs prepared for and participated in a trial lasting ten days, and spent significant time briefing and arguing in favor of post-trial motions before the trial court, and in briefing appeal issues before the Third Circuit.

The *Perez* Plaintiffs conducted a mock trial, and prepared and reported ready for the first day of an anticipated three-week trial.

Both the *Goldman* and *Perez* Plaintiffs also filed, briefed and argued in support of the numerous motions in limine that they filed before their respective scheduled trials, and briefed and argued in opposition to the numerous motions in limine filed by RadioShack.

Plaintiffs have spent a significant amount of time and money participating in all of the above-described tasks. As of August 31, 2007, Plaintiffs' Counsel's out-of-pocket costs have collectively reached $1,322,982.08, and would have been larger, had they not been as judicious in evaluating the appropriateness of each anticipated expense. They have also thus far collectively spent 32,280 hours litigating these cases, representing a lodestar value of $9,536,201.15. To keep the lodestar within reasonable limits, wherever suitable, counsel assigned tasks to associate attorneys and paralegals with hourly rates substantially lower than those of named partners.

Theses expenses in money and time will continue to increase while preparing for and participating in the three final approval hearings, assisting with settlement administration, and potentially in defending against any appeals that may be filed.

However, this additional time is negligible compared to the additional time and money that will be spent if the proposed settlement is not approved. The *Perez, Lloredo* and *Birns* Plaintiffs would need to prepare for and take their cases to trial and possibly through an appellate review. The *Goldman* Plaintiffs would need to complete the pending appeal process, and possibly prepare for and participate in a second trial and go through a second appellate process.

IV.   **THE SETTLEMENT**

The proposed settlement divides the class into two subgroups.

The first subgroup, the "80/80 Subgroup," consists of all class members who did not have employees clocking in at least 80 combined hours during at least 80% of the weeks when he or she worked as a YSM during the class period.  After much negotiation, RadioShack agreed to pay all applicable back overtime wages to each of these class members.  Their claims were given great weight as a result of the *Perez* ruling setting forth the objective "80/80 Test" and granting summary judgment in favor of all class members meeting its requirements, and the possibility that the ruling might be adopted by the Third Circuit in the *Goldman* appeal and by the trial courts in *Lloredo* and *Birns*.

The second subgroup, the "Primary Duty Subgroup" consists of all other class members.  RadioShack initially would not agree to make any payments to these class members, based on the indicators that these class members ultimately would recover nothing at trial (e.g., the *Goldman* verdict, the *Perez* admonition about an uphill battle, the Wisconsin summary judgment ruling, and the results of RadioShack's own mock trial).  After significant negotiations, RadioShack agreed to pay each of these class members $100.  RadioShack said that it would pay no more to these class members, because it did not want to set a precedent of paying money to settle what it believes are unwarranted claims.

The amounts to be paid to the two subgroups were independently negotiated, such that the agreed-upon payments to the 80/80 Subgroup members did not in any

way affect the agreed-upon payments to the Primary Duty Subgroup members, and *vice versa*. The agreed-upon payments to each subgroup were based on separate evaluations of the strengths and weaknesses involved with the claims of each.

Similarly, the amounts to be paid to these two subgroups did not in any way affect the attorneys' fees and costs that the parties ultimately agreed upon. The parties did not negotiate the fee and cost amounts until after the payment methods for the two subgroups were finalized. The subsequent fee and cost negotiations consisted solely of negotiating how much above the class member payments RadioShack would pay to provide Class Counsel with reimbursement for their costs and a reasonable fee for their efforts. As addressed below, the combined amount that has been agreed upon for costs and fees is a small fraction of the actual costs and fees incurred by Class Counsel during this litigation.

RadioShack initially agreed to pay $8.8 million, less amounts attributable to any class members who could not be located by a certain date, to settle the claims of all persons who were members of the class on the settlement agreement date. Of the original class of 4,484 members, only 167 (i.e., 3.7%) could not be located. The value of those claims was $92,447.22, and their loss reduced the initial $8.8 million available for settlement to $8,707,552.78. [5]

RadioShack also agreed to pay an additional amount to settle the claims of additional persons who were given the opportunity to become class members when

---

[5] Of the class members who could not be located, 134 with claims totaling $78,786.56 were from *Perez;* 31 with claims totaling $13,460.66 were from *Lloredo,* one with a $100 claim was from *Goldman,* and another with a $100 claim was from *Birns*. Those class members, and the value of each of their claims, are listed on the charts attached collectively as Exhibit 1.

the settlement notices were distributed, because RadioShack had inadvertently omitted their names from prior class lists.  An additional 64 class members, with claims totaling $47,606.84, were added through this process.  The value of their claims increases the total amount that RadioShack will have to pay to settle the overtime wage claims covered by these actions back up to $8,755,159.62. [6]

Under the proposed settlement, RadioShack would pay $3,584,038.27 of this amount to 861 "80/80 Subgroup" members, as reimbursement for all of their back overtime wages from the applicable class period, and an additional $353,800.00, at $100 each, to 3,538 "Primary Duty Subgroup" members.  The total class member payments would be $3,937,838.27.

Under the proposed settlement, RadioShack also would pay a total of $87,000 as incentive payments to the seven Class Representatives, whose assistance proved invaluable throughout the litigation.  As described in more detail below, the payments would be allocated to each Class Representative in relation to the amount of work performed during their respective cases.

Under the agreement, RadioShack would also pay $1,322,982.08 to Class Counsel as reimbursement for the actual costs they have incurred while litigating these cases.  The total cost amount may increase as more costs are incurred through the final resolution of these cases, but any increase in this amount will result in an equal decrease to the amount of fees that would be paid to Class Counsel.

---

[6] Of these 64 class members, 54 became class members by affirmatively opting into *Perez,* and ten became class members by not opting out of *Goldman.*  Their names, and the values of each of their claims, are listed on the chart attached as Exhibit 2.

Finally, under the agreement, RadioShack would pay the remainder, totaling approximately $3,407,339.27, to Class Counsel as a reasonable fee for their efforts in litigating these cases and obtaining a recovery for the class.  This represents only about one-third (35.7%) of the value of the actual lodestar fees of $9,536,201.15 that Class Counsel collectively accumulated so far in litigation.  That percentage of the lodestar will continue to decrease as more work is performed in obtaining final settlement approval and assisting with settlement administration.

## V.      **THE SETTLEMENT NOTICE**

In accordance with the Preliminary Approval Orders, notice of the proposed settlement was given via first-class mail, address service requested, to each class member.  The settlement administrator, The Garden City Group ("GCG"), insured that the best possible addresses were used first by running each address through the National Change of Address database, and then by running the addresses for any packets that were returned through an Advanced Address Search, using social security numbers.  Class Counsel then provided additional updates to GCG by using updated information made available by RadioShack and through calls and emails with class members.  As a result of these efforts, the notice reached all but 167 (i.e., 3.7%) of the settlement class.[7]

The substance of the Notice, which was based on samples available through the Federal Judicial Center, provided a comprehensive explanation of the proposed settlement in layperson's terms.  It included information on the nature of the cases,

---

[7] The declaration of Abbe Darr, attached as Exhibit 3, also encompasses persons who were not yet class members, and were instead only being given a chance to join in the class and the proposed settlement.  This is the reason for the discrepancy in numbers from the declaration and this brief.

the proposed settlement's general terms, the basis for his or her payment described on an individual payment report, how to dispute the payment report information, how to object to the settlement, the prerequisites for appearing at a final fairness hearing, and how to obtain more information.  This notice was reasonable and consistent with the requirements of Fed. R. Civ. P. 23(e)(1)(B).

## VI.   THE STANDARDS FOR EVALUATING THE SETTLEMENT

Federal Rule of Civil Procedure 23(e) governs the procedure for class action settlements.  The parties must present any proposed settlement to the court, which after a hearing, determines whether the proposal is "fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(1)(A),(C).

As *Goldman* involves a class action certified under Rule 23, this requirement clearly applies.  While *Perez* and *Lloredo* involve only collective FLSA actions, which do not outline a similar requirement, the procedures for class and collective actions often overlap, making a similar analysis appropriate.

### A.    THE PRESUMPTION OF FAIRNESS

An initial presumption of fairness for a settlement is established if the court finds that: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 535 (3d Cir. 2004), *quoting In re Cendant Corp. Litig.,* 264 F.3d 201, 232 n.18 (3d Cir. 2001)  Courts also should give weight to the "belief of experienced counsel that settlement is in the best interest of the

class." *See In re Orthopedic Bone Screw Prods. Liab. Litig.,* 176 F.R.D. 158, 184 (E.D. Pa. 1997).

In *Warfarin*, the Third Circuit found that the district court properly attached a presumption of fairness to a settlement "because the settlement resulted from intense arm's length negotiations between experienced counsel, came after over three years of active litigation and discovery, and was objected to by only a small fraction of the purported class." 391 F.3d at 535.

Similarly, the settlement of these overtime wage actions resulted from intense several-month-long arm's length negotiations between experienced counsel[8] after over four years of active litigation and discovery.  As described more fully below, only 1% of the class – 45 of the 4,399 class members – submitted objections.  These factors support a presumption of fairness for the proposed settlement.

**B.    THE *GIRSH* FACTORS**

In the alternative, the Third Circuit has set forth nine factors to consider:

> (1) the complexity, expense and likely duration of the litigation…; (2) the reaction of the class to the settlement…, (3) the stage of the proceedings and the amount of discovery completed…, (4) the risks of establishing liability…; (5) the risks of establishing damages…; (6) the risks of maintaining the class action through the trial…; (7) the ability of the defendants to withstand a greater judgment…; (8) the range of reasonableness of the settlement fund in light of the best possible recovery…; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation….

---

[8] While the negotiations began with a four-day session overseen by Magistrate Judge Nan R. Nolan from June 17-21, 2001, the negotiations continued for the next eight months, relating to terms in the settlement agreement, who should be covered by the settlement, and in what capacity.  The settlement agreement was not finalized and executed until mid-February 2007.

*Warfarin,* 391 F.3d at 534-35 (3d Cir. 2004), *quoting Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir. 1975).  The Seventh and Eleventh Circuits apply similar factors.  *See Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir. 1996)[9]; *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984).[10]

While the court must consider each factor, it may combine consideration of some factors or determine that others do not apply based on the facts of the case or the stage of the proceedings.  *See, e.g., Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118 (3d Cir. 1990) (combining *Girsh* factors into two-step inquiry); *In re Linerboard Antitrust Litig.,* 296 F. Supp.2d 568, 578-82 (E.D. Pa. 2003) (combining *Girsh* factors in analyzing settlement).

The *Girsh* factors are "a guide and the absence of one or more does not automatically render the settlement unfair.  Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh.*"  *Orthopedic Bone Screw,* 176 F.R.D. at 184.

1.   **The Stage of the Proceedings and the Amount of Discovery Completed Support the Proposed Settlement.**

For this factor, the court should consider whether the parties are far enough along in the case to have an adequate appreciation of the case's merits before

---

[9] The listed factors are the strength of the case compared to the offer; the likely complexity, length and expense of litigation; the amount of opposition; the opinion of competent counsel; the stage of the proceedings; and the amount of discovery completed.  *Isby,* 75 F.3d at 1199.

[10] The court is to evaluate whether there was fraud or collusion involved in arriving at the settlement, while considering the likelihood of success at trial; the range of possible recovery; the point on or below that range that is fair, adequate and reasonable; the complexity, expense and duration of litigation; the substance and amount of opposition; and the stage of the proceedings. *Bennett,* 737 F.2d at 986.

negotiating.  *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 813 (3d Cir. 1995); *Linerboard,* 296 F. Supp. 2d at 568.

Here, the parties reached the proposed settlement after completing discovery in *Perez* and *Goldman,* involving analyzing tens of thousands of pages of materials, participating in over 100 depositions, conducting collateral investigations, and evaluating materials presented by experts.  The *Perez, Goldman* and *Lloredo* Plaintiffs also fully briefed, argued and obtained rulings on certification motions, and the *Perez* and *Goldman* Plaintiffs fully briefed, argued and obtained rulings on summary judgment motions and motions in limine.

In addition, the *Goldman* Plaintiffs tried their case; briefed, argued and obtained rulings on post-trial motions; and submitted briefs in support of their appeal.  The *Perez* Plaintiffs also conducted a mock trial and prepared and reported ready for the first day of an anticipated three-week trial.

The amount of discovery completed and the status of the proceedings assure beyond doubt that counsel have an adequate appreciation of the strengths and weaknesses of their cases against RadioShack.

## 2. __The Risks Involved Support the Proposed Settlement.__

The inquiry on this factor "survey[s] the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."  *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d 283, 319 (3d Cir. 1998).

As addressed above, the risks of obtaining no recovery for members of the "Primary Duty Subgroup" are significant, given the adverse ruling in *Goldman,* the *Perez* admonition about an uphill battle, the summary judgment ruling in favor of RadioShack in Wisconsin, and the results of RadioShack's mock trial. At least six district or magistrate judges have reviewed the primary duty factor, and none have provided any feedback favorable to the class on this issue. This weighs heavily in favor of the proposed settlement.

A risk also is involved with the recoveries for the members of the "80/80 Subgroup," who would receive all their back overtime wages if the proposed settlement is approved. RadioShack has indicated that it plans to appeal the *Perez* 80/80 ruling if the case is resolved through non-settlement means, and since that ruling involved a matter of first impression, it is possible that the Seventh Circuit may reverse that decision. In addition, the *Goldman* 80/80 Subgroup members may receive nothing, unless the Third Circuit reverses the *Goldman* court's ruling and the jury's verdict, and adopts the standard set forth in *Perez*. The recoveries for the *Lloredo* 80/80 Subgroup members would also be uncertain, as the *Lloredo* court has not yet evaluated that issue. These risks weigh in favor of settlement.

In addition, RadioShack has indicated that it may move to decertify the *Goldman* class if its members are successful in their appeal. There is a risk that RadioShack may be successful in such a motion, based on a recent ruling from the United States District Court for the Middle District of Pennsylvania, holding that workers cannot seek relief for unpaid overtime wages in an action that includes

both an "opt-in" collective action class and an "opt-out" class action class.  *See Otto v. Pocono Health Sys.,* No. 4:06-CV-1186, 2006 WL 3059924 (M.D. Pa. Oct. 27, 2006).  If the *Goldman* court agrees, 350 state claim class members will lose their right to participate in that class action, leaving only 178 opt-in class members.

Maintaining class action status is critical.  The risk of losing class status has "a great impact on the range of recovery one can expect to reap from the action," *see In re General Motors,* 55 F.3d at 817, and weighs heavily in favor of settlement.  *See In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 181 (E.D. Pa. 2000); *Fisher Bros. v. Phelps Dodge Indus.,* 604 F. Supp. 446, 450 (E.D. Pa. 1985).

### 3.   The Settlement Amount is Within the Range of Reasonableness in Light of the Best Possible Recovery and the Above Risks.

In evaluating a proposed settlement, the court must determine whether the recovery falls within that range of reasonableness, and "not whether it is the most favorable possible result of litigation."  *Lazy Oil Co. v. Wotco Corp.* 95 F. Supp. 2d 290, 338-39 (W.D. Pa. 1997), *quoting Fisher Bros. v. Cambridge-Lee Indus., Inc.,* 630 F. Supp. 482, 489 (E.D. Pa. 1985).  *See also Davies v. Continental Bank,* 122 F.R.D. 475, 480 (E.D. Pa. 1988).

"[C]ompromise is the essence of a settlement."  *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977).  The court must "guard against demanding too large a settlement based on the view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  *General Motors,* 55 F.3d at 806.  *See also Cotton,* 559 F.2d at 1330.

Thus, "[w]hile the court is obligated to ensure that the proposed settlement is in the best interest of class members by reference to the best possible outcome, it must also recognize that settlement typically represents a compromise and not hold counsel to an impossible standard."  *In re Aetna Inc.,* MDL No. 1219, 2001 WL 20928, at *12 (E.D. Pa. Jan. 4, 2001).

"The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."  *Linerboard,* 296 F. Supp. 2d at 581, *quoting City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir. 1974).

As mentioned above, the 80/80 Subgroup members will receive all their back overtime wages if the proposed settlement is approved.  While the remaining class members will receive only $100 each, a fraction of their actual back overtime wages, Plaintiffs face enormous risks in proving liability for these class members and in maintaining the class status for the *Goldman* state claim class members.  These class members likely will recover nothing independent of the proposed settlement, and in light of this significant risk, the certain recovery of $100 each is appropriate.

### 4.   The Complexity, Expense and Likely Duration of the Litigation Supports the Proposed Settlement.

This factor is intended to capture "the probable costs, in both time and money, of continued litigation."  *General Motors,* 55 F.3d at 812, *quoting Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir. 1974).

If the proposed settlement is not approved, the *Goldman* class will spend significant additional time and money preparing a reply in support of the pending

appeal, preparing for and participating in argument of the appellate motion, and potentially preparing for and participating in a second trial and a second round of post-trial motions and appeals.  Similarly, the *Lloredo* Plaintiffs will participate in extensive discovery and pretrial motions, and the *Lloredo* and *Perez* Plaintiffs will spend significant resources preparing for and participating in trial and possibly post-trial motions and an appellate review.

These costs will reduce the value of any recovery to the class, and will delay any payment to the class by years.  This weighs in favor of the proposed settlement. *See Warfarin,* 391 F.3d at 536.

### 5. The Relatively Small Percentage of Objections Supports the Proposed Settlement.

Plaintiffs have received objections from only 45 class members, representing only 1% of the class.

This overwhelmingly positive reaction of the class supports the settlement. *See, e.g., Stoetzner,* 897 F.2d at 118-19 (3d Cir. 1990) (29 objections out of class of 281 members "strongly favors settlement"); *Laskey v. International Union, UAW,* 638 F.2d 954, 957 (6th Cir. 1981) (presence of only seven objections out of a 109-member class considered); *Boyd v. Bechtel Corp.,* 485 F. Supp. 610, 624 (N.D. Cal. 1979) (that only 16% of class objected is "persuasive" of settlement's adequacy)

A chart outlining the subject of each objection is attached as Exhibit 4, and copies of the objections are attached as Exhibits 5-49.[11]

---

[11] The exhibits to the objection of Peggy Johnson are lengthy, resulting in a 180-page objection packet.  The exhibits to her objection thus have not been reproduced herein.  Her entire objection has instead been separately filed in *Perez,* the case in which she is a class member.

Some objectors feel that the settlement fund should be allocated equally to all class members, regardless of whether they meet the requirements of the 80/80 Test. However, the methods of paying each subgroup were separately negotiated because of the significant differences between their risks of non-payment.  It would be unfair and inequitable to reduce payments to members of the 80/80 Subgroup to make up for the significant risk of non-payment that the other class members face.  In addition, this would violate a term of the settlement that is material to RadioShack: keeping the Primary Duty Subgroup payments at only $100 each.

Many objectors also set forth facts supporting their overtime wage claims. For example, many objectors describe the primary duties of YSMs as involving non-management duties, including selling, and say they spent most of their time on those duties.  Others discuss the little discretion they felt they had, the control or abuse to which they say they were submitted by their superiors, and the pay they say was similar to that of their employees.  Others claim that RadioShack's liability could have been better established if RadioShack had not falsified documents and testimony, or changed its policies after these lawsuits were filed to cover up its wrongdoing.

Plaintiffs presented similar arguments in the *Goldman* trial and appeal and the *Perez* and *Lloredo* briefs and arguments, and suspect that Wisconsin counsel presented similar arguments.  The *Goldman* jury and the various courts were not impressed, and thus far have found RadioShack's position on these matters more

persuasive.  Plaintiffs had to consider the risk that juries and courts will be equally unimpressed in the future when evaluating the settlement amount.

Other objectors say they should be compensated more because they worked many overtime hours due to corporate requirements and under-staffing, and made significant personal sacrifices to work those long hours.  While the parties are sympathetic to these hardships, the law is what governs whether a payment should be made for overtime wages.  Unfortunately, the risk remains that future juries and the courts will continue to find that the law does not require RadioShack to pay overtime wages to members of the Primary Duty Subgroup, and as a result, the settlement amount reflects that risk.

Other objectors say that RadioShack should have known that it was violating the law because of what happened in the California litigation, but the California overtime wage statute is much more liberal than the federal and Pennsylvania statutes, so the result in that case has no application here.

Other objectors say that RadioShack has now admitted that it violated the law because it is settling, and that RadioShack thus should be held responsible for paying overtime wages, or it will be unjustly enriched.  However, RadioShack has admitted to no wrongdoing, and has instead agreed to compromise these claims solely to put these lawsuits behind it.

Other objectors claim that their low settlement amounts were offered in retaliation for events unrelated to these class actions, or raise other unrelated alleged misdeeds by RadioShack such as discrimination.  Plaintiffs have never

claimed that these class actions were directed at redressing wrongs for retaliation or discrimination, and this is not the proper forum to address any such wrongs that may or may not have occurred.

Finally, certain objectors complain, in one form or another, about Class Counsel's request for an award of attorneys' fees.  However, none of the objectors analyze the fee using the factors adopted by the Third Circuit, addressed below.  In addition, these objections seem to be based on the mistaken belief that the amount of the fee payment bears on the amount of class member payments, when it does not.  If the courts deny any part of the requested fee payment, and the parties do not feel that this would be justified, the denied amount would not revert to class members.  Rather, the parties and the court would have to address whether the denied amounts should revert to RadioShack or be paid instead to a charity.

### 6.    The Ability to Withstand a Greater Judgment is Neutral.

The ability of RadioShack to withstand a greater judgment neither favors nor disfavors approval of the proposed settlement here.  *See Warfarin,* 391 F.3d at 538 (although defendant could have afforded a larger amount does not mean it should have to pay any more than the settlement amount).

## VII.    THE CLASS REPRESENTATIVE PAYMENTS

"Incentive awards are not uncommon in class action litigation."  *In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 400 (D.D.C. 2002).  In fact, courts "routinely approve incentive awards to compensate named plaintiffs for

the services they provided and the risks that they incurred during the course of the class action litigation." *Id.*

The Class Representatives in these actions provided significant services that resulted in a benefit to the class.

Mark Goldman assisted with gathering and providing facts to be used in drafting the Complaint, supporting certification, and litigating the action; prepared and sat for a day-long deposition; prepared an affidavit and questionnaire supporting the action; assisted with responding to discovery requests and gathered responsive documents; prepared for, traveled daily for, and attended the ten-day trial; provided trial testimony; and assisted with communications with class members.  In exchange for the significant amount of time and effort that he has put forth, the parties propose providing him with an incentive payment of $20,000.

Similarly, Alphonse Perez and Douglas Philips assisted with gathering and providing facts to support the litigation and motions; assisted with responding to discovery requests and gathered responsive documents; prepared for and testified during a deposition and hearing in support of certification; prepared for trial; and assisted with communications with class members.  For this work, the parties propose providing each with an incentive payment of $20,000.

Rudy Lloredo and Christopher Wright also assisted with gathering and providing facts; prepared for and testified during depositions; and assisted with communications with class members.  For this work, the parties propose providing each with an incentive payment of $5,000.

Finally, Brendan Birns and Christopher Pelky assisted with gathering and providing facts.  For this work, the parties propose providing each with an incentive payment of $1,000 each.

Without these class representatives, the class members would have recovered nothing.  The class representatives thus should receive reasonable compensation for their efforts, in the amounts requested above.

## VIII.  <u>THE LITIGATION COSTS</u>

Class Counsel request reimbursement of the $1,322,982.08 in out-of-pocket expenses they have incurred thus far.  These costs consist in large part of fees paid to experts, and costs associated with participating in 100+ depositions, collecting and processing tens of thousands of pages of discovery materials, preparing for two trials, and participating and traveling for one ten-day trial.

These costs also include payments of $2,500 each that will be made to eighteen witnesses who testified at deposition and acted as consultants throughout the litigation, and payments of $5,000 each that will be made to four witnesses who testified at both deposition and trial and also acted as consultants.  The parties sought guidance from the *Perez* court before agreeing to these witness/consultant payments, and Judge Pallmeyer agreed that they would be appropriate.

The expenses advanced by Class Counsel were reasonable and necessary to the prosecution of these cases, and Class Counsel should therefore be reimbursed for them.  *See In re Fidelity/Micron Sec. Litig.,* 167 F.3d 735, 737 (1st Cir. 1999).

## IX.   <u>CLASS COUNSEL FEES</u>

There are two primary methods for calculating attorney fees:  the lodestar method, and the percentage of the fund method.  *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 732 (3d Cir. 2001).

The lodestar method involves a "court determin[ing] an attorney's lodestar award by multiplying the number of hours he or she worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer."  *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n.1 (3d Cir. 2000).  The court may then apply a "multiplier," intended to provide compensation for the economic risks that counsel took in prosecuting the litigation without any guarantee of payment.  *See, e.g., Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 112 (3d Cir. 1976); *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 168 (3d Cir. 1973).

"The lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation."  *Cendant Corp. PRIDES,* 243 F.3d at 732.

On the other hand, the percentage of the fund method "resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class."  *Id.* at 732 n.10.  It is "generally favored in cases involving a

common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for the successes and penalizes it for failure" by aligning counsel's interests with those of the class. *Id*. at 732. *See also Gunter,* 223 F.3d at 195 n.1.

By far, the lodestar method would result in the largest fee award for Class Counsel. Class Counsel have thus far collectively worked on these cases for 32,280 hours, representing a lodestar fee of $9,536,201.15.

The requested fee amount, by contrast, is only about one-third of that amount ($3,407,339.27). While it represents 38.9% of the total settlement amount, it does not represent what is traditionally understood to be a percentage of the settlement fund, because no money is being taken away from class members to pay this amount to Class Counsel. This represents a separately negotiated amount designed to provide compensation for a (very small) portion of the time Class Counsel spent on these matters. If this fee amount is not approved by the Court, the money will not go back into the settlement fund for payment to class members. Rather, a decision would need to be made about whether these funds should to revert to RadioShack or be paid to a charity. Plaintiffs contend that neither option is appropriate, and that their requested fee award should instead be granted.

The requested fee thus does not fit cleanly into the category of a lodestar fee or a percentage of the fund fee.

The Third Circuit has set forth the following seven factors to be considered in determining whether a requested fee is appropriate: (1) the size of the fund and the

number of persons benefited; (2) the presence/absence of substantial objections; (3) the skill and efficiency of counsel; (4) the complexity and duration of the litigation; (5) the risk of non-payment; (6) the amount of time devoted to the case by plaintiff's counsel; and (7) awards in similar cases. *Gunter,* 223 F.3d at 195 n.1.

Most of these factors have been addressed above. The proposed settlement would result in payments totaling $4,024,838.27 to 4,399 class members and Class Representatives, and is reasonable in light of the risks involved with continuing to litigate these complex cases. Only 1% of class members have objected to the proposed settlement, and only five have expressed dissatisfaction with the fee amount. One objector, John Moore, even thanked counsel for their efforts.

These cases have been litigated efficiently and aggressively for almost five years by counsel experienced in complex class action litigation, who took these cases on a contingency basis and risked receiving no payment for their efforts. Despite the risk of non-payment, Class Counsel devoted 32,280 hours so far on these cases, and will continue to devote more time until the settlement is finally approved and administration is complete. This commitment of resources has limited the work that Class Counsel could perform for other cases, and the fees that Class Counsel could recover from such other cases.

In addition, comparable awards have been awarded in other actions. *See, e.g., Taubenfeild v. AON Corp.,* 415 F.3d 597, 598, 600 (7th Cir. 2005) (affirming fee of 30% of settlement fund, and noting that fees of 30-39% were awarded in thirteen Northern District of Illinois cases); *In re U.S. Bancorp. Litig.,* 291 F.3d 1035, 1038

(8th Cir. 2002) (36% of settlement fund); *Carlson v. C.H. Robinson Worldwide, Inc.*, No. 02-3780 JNE/JJG, 2006 WL 2671105 (D. Minn. Sept. 18, 2006) (35.5% of settlement fund).

The cases that are the subject of the pending motion, unlike the others cited, bears the unique characteristic of the proposed fee award having no possible effect on the amount that will be paid to any class member, and representing only a small fraction, rather than a multiplier, of the lodestar.  This further justifies the amount of the requested fee award.

## X.     CONCLUSION

For all of the above reasons, Plaintiffs respectfully request that the court grant final approval of the proposed settlement and the proposed payments to the class representatives and class counsel.

DATED:  September 10, 2007               **HERMAN & MERMELSTEIN, P.A.**

                                        By:   /s/ Jeffrey M. Herman                .
                                              Attorneys for Plaintiffs

                                        **TOUHY & TOUHY, LTD.**

                                        By:   /s/ Daniel K. Touhy                .
                                              Attorneys for Plaintiffs

                                        **CALLAHAN, McCUNE & WILLIS, APLC**

                                        By:   /s/ Robert W. Thompson             .
                                              Attorneys for Plaintiffs